No. 24-2794

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

37CELSIUS CAPITAL PARTNERS, L.P, and

37CELSIUS CAPITAL PARTNERS, LLC

        *Plaintiffs-Appellants*,

v.

INTEL CORPORATION, and

CARE INNOVATIONS LLC,

        *Defendants-Appellees.*

Appeal from the September 11, 2024 Judgment and September 10, 2024 Order of the
United States District Court for the Eastern District of Wisconsin,
District Court Case No. 20-CV-621
The Honorable Judge William E. Duffin, United States District Judge, Presiding

## REPLY BRIEF OF THE PLAINTIFFS-APPELLANTS, 37CELSIUS CAPITAL
## PARTNERS, L.P AND 37CELSIUS CAPITAL PARTNERS, LLC

HANSEN REYNOLDS LLC
Timothy M. Hansen
Brent D. Nistler
Gabriel D. Grahek (Counsel of Record)
301 N. Broadway, Suite 400
Milwaukee, Wisconsin 53202
(414) 455-7676
thansen@hansenreynolds.com
bnistler@hansenreynolds.com
ggrahek@hansenreynolds.co

*Attorneys for Plaintiffs-Appellants,*
*37celsius Capital Partners, L.P, and 37celsius Capital Partners, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

ARGUMENT ............................................................................... 1

 I. THE NDA DOES NOT AFFECT THE TERM SHEET .................................... 1

II. THE TERM SHEET IS A TYPE II AGREEMENT ....................................... 3

III. THE DISTRICT COURT MADE A CONTRACT INTERPRETATION, NOT A "BUT
    FOR" ANALYSIS ................................................................... 10

IV. THE COURT DID NOT MAKE A FACTUAL FINDING, BUT A FINDING ON
    CONTRACTUAL INTERPRETATION ...................................................15

CONCLUSION ............................................................................17

CERTIFICATION OF RULE 32(a)7(B)(ii) .............................................. 18

# TABLE OF AUTHORITIES

*Alta Berkeley VI C.V. v. Omneon, Inc.*,

    41 A.3d 381 (Del. 2012) ............................................................................ 3

*Benchmark Invs. LLC v. Pacer Advisors, Inc.*, No. N23C-03-171 MAA CCLD,

    2024 WL 3567367 (Del. Super. Ct. July 29, 2024) ...................................... 15

*Brown v. Cara*,

    420 F.3d 148 (2d Cir. 2005). .............................................................. 4, 7, 8

*Cambridge Cap., LLC v. Ruby Has LLC*,

    565 F. Supp. 3d 420 (S.D.N.Y. 2021) ............................................... 5, 7, 8, 9

*CapLOC, LLC v. McCord*, 17-cv-5788,

    2018 WL 3407708 (S.D.N.Y. Jun. 12, 2018) ........................................... 5, 9

*Cox Commc'ns, Inc. v. T-Mobile US, Inc.*,

    273 A.3d 752 (Del. 2022) ................................................... 3, 4, 8, 11, 12, 13

*EQT Infrastructure Ltd. v. Smith*,

    861 F. Supp. 2d 220 (S.D.N.Y. 2012) ...................................................... 11

*Greentech Consultancy Co., WLL v. Hilco IP Servs., LLC*,

    2022 WL 1499828 (Del. Super. May 11, 2022) ...................................... 4, 13

*Guerini Stone Co. v. P.J. Carlin Constr. Co.*,

    240 U.S. 264,  36 S.Ct. 300, 60 L.Ed. 636 (1916) ........................................................ 2

*Matter of Est. of Landon*,

    2023 WL 5533132 (Del. Ch. Aug. 28, 2023) ...........................................................4, 13

*SIGA Techs., Inc. v. PharmAthene, Inc.*,

    67 A.3d 330 (Del. 2013) ......................................................... 5, 7, 8, 11, 12, 13

*Siga Techs., Inc. v. PharmAthene, Inc.*,

    132 A.3d 1108 (Del. 2015) ................................................... 8, 11, 12

*State ex rel. Mitchell v. Wolcott*,

    46 Del. 362, 83 A.2d 759 (1951) ................................................................ 10

*Straine DM Holdings LLC v. Breault*, No. N24C-02-049 VLM CCLD,

    2025 WL 275408 (Del. Super. Ct. Jan. 22, 2025)...................................................4, 13

*Town of Cheswold v. Cent. Delaware Bus. Park*,

    188 A.3d 810 (Del. 2018) ........................................................................ 2,

*Trianco, LLC v. IBM Corp.*,

    583 F. Supp. 2d 649 (E.D. Pa. 2008) .......................................................... 8

## ARGUMENT

### I.    THE NDA DOES NOT AFFECT THE TERM SHEET

Intel Corporation ("Intel") argues the Non-Disclosure Agreement's ("NDA") "Hold Harmless" provision bars 37celsius Capital Partners L.P. and 37celsius Capital Partners, LLC (collectively, "37celsius") lost profits claim. Intel mischaracterizes 37celsius's claim as "37celsius seeks from Intel profits it claims it lost because Intel did not conclude the proposed sale of Care to 37clesius." (RB 21.)[1] That is not 37celsius's argument. 37celsius seeks damages for the breach of the Term Sheet during the process of negotiation.

Here, the NDA listed the "Obligations of the Receiving Party" in Section 2 (a) as: "The Receiving party will maintain the confidentiality of the Confidential Information of the disclosing party with at least the same degree of care that it uses to protect its own confidential and proprietary information, but no less than a reasonable degree of care under the circumstances." (R. 28-2, ASA 14.) The NDA contains various restrictions on the use, release, and disclosure of Confidential Information, as defined in Section 1. But the purpose of the agreement stops there.

The parties signed the NDA for protection against unauthorized disclosure of confidential information. Then, the parties entered into another agreement to negotiate for the sale of Care Innovations, LLC ("Care") to 37celsius. In the creation of the second agreement, the Term Sheet, the parties subjected the disclosure of protected information to the same restrictions as the NDA.

And this is why the NDA is not referenced anywhere in the Term Sheet but the "Confidentiality" section. (R. 29-2, ASA 4.) Intel is correct—the confidentiality measures of the Term Sheet were subject to the NDA.[2] The only rational reading of this provision is the Term Sheet is confidential. Such an interpretation gives the proper meaning to the NDA's Section 13(e) stating:

---

[1] All references to Intel's Answering Brief ("RB") use the brief's internal pagination.
[2] The Term Sheet references the NDA as the "Confidentiality Agreement." (R. 29-2, ASA 4.)

> This Agreement is the sole and entire agreement between the parties about the Confidential Information and all restrictions thereon; it supersedes all prior or contemporaneous oral or written agreements, negotiations, communications, understandings, and terms, whether express or implied about the Confidential Information, and may not be amended except in a writing signed by a duly authorized representative of the parties. Any other agreements between the parties, including non-disclosure agreements, will not be affected by this Agreement, and any confidential, proprietary and trade secret information of the disclosing party disclosed other than in connection with the Transaction will be governed by the agreement between the parties relating to that information.

(R. 28-2 at 7, NDA § 13(e), ASA 19.) "Confidential Information" is defined as the "confidential, proprietary and trade secret information of the disclosing party disclosed in connection with the Transaction." (R. 28-2 at 2, NDA § 1(c).) The entirety of this integration clause serves to limit its effect solely to the release of confidential information as specified above. Section 13(e) limits the NDA and states "[a]ny other agreements between the parties…**will not be affected by this Agreement**" thereby precluding inclusion of the NDA's terms into subsequent agreements. (*Id.*)(emphasis added)

Other documents or agreements can be incorporated by reference "[w]here a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it." *Town of Cheswold v. Cent. Delaware Bus. Park*, 188 A.3d 810, 818–19 (Del. 2018). But, "[a] mere reference in one agreement to another agreement, without more, does not incorporate the latter agreement into the former by reference." *Id.* Rather, "[t]o incorporate one document into another, an explicit manifestation of intent is required." *Id.* In addition, "when incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes." *Id.*; *see also Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277, 36 S.Ct. 300, 60 L.Ed. 636 (1916) ("[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.")

The Term Sheet does not incorporate the entire NDA, which it titles the "Confidentiality Agreement," but merely subjects the confidentiality provisions within the Term Sheet to the non-disclosure requirements of the NDA. Any other interpretation incorporates the NDA far greater than intended by the parties.

Under Delaware's canons of construction, courts interpret contracts "according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc*., 41 A.3d 381, 385 (Del. 2012). The court "must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions." *Id*. at 386. Intel's interpretation of the NDA and term sheet violates these canons. Intel fails to give effect to section 13(e) of the NDA (the "no effect" provision) or alternatively asks the Court to interpret it contrary to its plain meaning. And Intel's reading of the NDA would simply erase the clear Type II language in the term sheet.

Intel makes a last attempt at an argument regarding the release of confidential information by asserting the general/specific canon. The Court need not even approach this step. The NDA cannot impute its own damages limitations into the Term Sheet where the Term Sheet has identified only the "Confidentiality" portion as subject to the NDA. For the reasons noted above, the Term Sheet was only subject to the confidentiality provisions of the NDA, not the entire agreement.

## II. THE TERM SHEET IS A TYPE II AGREEMENT

Intel next argues the Term Sheet is not a Type II Agreement. Intel misses the core point 37celsius asserts and conflates the requirements of a Type I agreement with those of a Type II agreement. Type II agreements exist where parties "agree on certain major terms, but leave other terms open for future negotiation." *Cox Commc'ns, Inc. v. T-Mobile US, Inc*., 273 A.3d 752, 761 (Del. 2022). Unlike Type I agreements, which commit parties to their ultimate contractual objective, Type II agreements obligate parties to negotiate the open issues in good faith. *Cox*, 273

A.3d at 761; *see also Straine DM Holdings LLC v. Breault*, No. N24C-02-049 VLM CCLD, 2025 WL 275408, at *4 (Del. Super. Ct. Jan. 22, 2025) "The lack of an express good faith obligation therefore does not hinder [a] Court's conclusion that the Term Sheet is a Type II preliminary agreement." *Greentech Consultancy Co., WLL v. Hilco IP Servs., LLC*, 2022 WL 1499828, at *13 (Del. Super. May 11, 2022). "Type II preliminary agreements are binding and enforceable contracts." *Id.* Put differently, an "agreement to agree is not fully binding on the open terms yet to be negotiated; but the parties are bound to negotiate those open terms in good faith." *Straine DM Holdings LLC*, 2025 WL 275408, at *4 (*citing Matter of Est. of Landon*, 2023 WL 5533132, at *3 (Del. Ch. Aug. 28, 2023)

The court in *Greentech Cons. Co*. distinguished its own contract and the one in *SIGA*.

> Unlike the agreement in *SIGA*, the Term Sheet here did not expressly state that the parties would exercise "good faith" in negotiating the open issues. At argument, the parties agreed the Term Sheet nevertheless contained an implied obligation to negotiate in good faith. The Supreme Court of Delaware's recent decision in *Cox Communications, Inc. v. T-Mobile US, Inc.* accords with that conclusion. The agreement in *Cox Communications* similarly did not contain an express obligation of good faith. Still, the Supreme Court recognized it as a Type II preliminary agreement. The lack of an express good faith obligation therefore does not hinder this Court's conclusion that the Term Sheet is a Type II preliminary agreement.

*Greentech Cons. Co*., 2022 WL 1499828, at *13 (Del. Super. Ct. May 11, 2022)

The Term Sheet here fits squarely within that definition. In several places, it expresses the parties' intent to negotiate toward a final deal, in language already recognized by the courts as giving rise to Type II obligations. The "timing" provision, for example, states the parties "will work to close the transaction as quickly as possible after signing" the term sheet. (R. 29-2 at 2). This is nearly identical to the language in *Brown v. Cara*, where the parties agreed to "work together" on a real estate venture "in accordance with the terms and conditions outlined [in a memorandum of understanding]." 420 F.3d 148, 158 (2d Cir. 2005).

4

The Second Circuit held "we cannot imagine more clear evidence of an intention to be bound" to a Type II obligation to negotiate. *Id.*; *see also Cambridge Cap., LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 432 (S.D.N.Y. 2021) (applying Delaware law) (finding a Type II agreement where the parties expressed their "intent to move forward to a closing as quickly as possible"). The term sheet's exclusivity provision further prohibits Intel from negotiating with third parties or "enter[ing] into any agreement, arrangement or understanding requiring it to abandon, terminate, or fail to consummate the Transaction with 37c." (R. 29-2 at 3.) This again reflects Intel's commitment to work toward the intended deal with 37celsius, and not with any other buyer. Courts have recognized Type II agreements in analogous circumstances. *See, e.g., Cambridge Cap.*, 565 F. Supp. 3d at 432-33 (letter of intent included exclusive-negotiations period); *CapLOC, LLC v. McCord*, 17-cv-5788, 2018 WL 3407708 at *11 (S.D.N.Y. Jun. 12, 2018) ("The Term Sheet obligates the parties to negotiate exclusively over a period of time and sets out a general framework of material terms in non-binding fashion.").

The term sheet also provides detailed terms of the contemplated transaction with 37celsius, using mandatory language—e.g., Intel "will contribute" its equity to the new entity, that it "will authorize" 37celsius to access records for due diligence, and laying out specific terms which the "definitive agreements … will contain." (R. 29-2 at 1-3.); *cf. Cambridge Cap.*, 565 F. Supp. 3d at 442 (where the LOI used "words that are mandatory and not merely aspirational"). And finally, the term sheet expressly states it "reflects the intention of the parties." (R. 29-2 at 4.)("No Binding Agreement"); *cf. SIGA Techs., Inc. v. PharmAthene, Inc.,* 67 A.3d 330, 346 (Del. 2013) (concluding the term sheet "reflects an intent on the part of both parties to negotiate toward a license agreement"). In particular, the term sheet between Intel and 37celsius was unusually detailed, and there was extensive partial performance, all the way to the execution of definitive

agreements and executed documents placed in escrow. (*See* R. 38 ¶¶ 40-43.) In sum, all the

relevant factors show the parties here entered into a Type II agreement.

Intel initially argues 37celsius "waived any argument that the Term Sheet contains an

express commitment to negotiate a final agreement." (RB 27.) This is false. In response to Intel's

motion for partial summary judgment on the lost profits claims, 37celsius argued:

> What is relevant is the Term Sheet's confirmation that "*The parties will
> work to close the transaction as quickly as possible after signing*, subject
> solely to the receipt of the third party consents set forth in Exhibit B."
> (emphasis supplied). This language acknowledges the stated expectations
> and intent that an ultimate agreement would be reached, and that Intel would
> comply with the Exclusivity Provision and its good faith obligations.

(R. 39 at 19.) It continued with:

> Intel's breach of the Exclusivity Provision was a component of its breach of
> its duty to negotiate in good faith. By negotiating with iSeed during the
> entirety of the Exclusivity Period and subsequently contracting with iSeed,
> Intel turned its back on the Term Sheet's Exclusivity Provision and turned
> its back on its obligation to work to closely with 37celsius—not iSeed—on
> the acquisition of Care.

(R. 39 at 20.) Further, 37celsius argued "The evidence will show that Care, intending that 37celsius

act thereon, made the definite and discrete promise to 37celsius that 37celsius would have the

exclusive right to solicit and negotiate an agreement to acquire a controlling interest in Care." (R.

39 at 28). 37celsius has argued the Term Sheet contains an express commitment to negotiate a final

agreement from the start of this litigation. Intel is incorrect in arguing otherwise. In addition, Intel

concedes 37celsius argued the same in its motion for reconsideration. (RB 27)

According to Intel, the Term Sheet never states the parties "'specifically agree' to negotiate

with each other toward a final deal." to negotiate with each other in an effort to reach a final

agreement at all." (RB 30). That is false. As noted above, the parties expressed their intent to

"work to close the transaction as quickly as possible." (R. 29-2 at 2.) This is "clear evidence" of an agreement to negotiate in good faith. *Brown*, 420 F.3d at 158.

Nevertheless, Intel claims its commitment is unenforceable because of the Term Sheet's "no binding agreement" and "no reliance" provisions. (RB 29). This argument is misplaced. Type II agreements routinely state they are non-binding. The term sheet in *SIGA I*, for example, bore a footer reading "Non Binding Terms," 67 A.3d at 336; and the letter of intent in *Cambridge Capital* contained a "Non-Binding Agreement" provision similar to the one in Intel's and 37celsius's term sheet, 565 F. Supp. 3d at 434. In both cases, this simply meant the parties were not strictly bound to the ultimate transaction; but they still had a duty to negotiate toward that end in good faith. *See SIGA I*, 67 A.3d at 349; *Cambridge Cap.*, 565 F. Supp. 3d at 446.

The same is true here. The provisions on which Intel relies simply make clear "no contract or agreement providing for any transaction … shall be deemed to exist … unless and until a final definitive agreement has been executed," and the parties' negotiations did not "obligate[ ] either party to enter into any further agreement." (R. 29-2 at 4) ("No Binding Agreement" and "No Reliance"). In short, they agreed to "work to close the transaction" (*id*. at 2), but they were not contractually bound to execute a final agreement, so long as they negotiated in good faith toward that end. That is the definition of a Type II agreement. *See SIGA I*, 67 A.3d at 349 ("A Type II agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith.").

Intel's repeatedly insists it had the right to terminate the term sheet. (RB 27-28.) The Term Sheet stated it would cease to be in force upon the execution of a definitive agreement, upon mutual consent of the parties, or if Intel gave notice of termination on or after February 2, 2017. (R. 29-2 at 4) ("Termination"). Intel contends its right to terminate precludes the Type II

designation. (RB 27-28) Not so. Again, by definition a Type II preliminary agreement does not require a party to consummate the final deal; it can back out for good-faith reasons. But while the preliminary agreement is in effect, a party is still bound by its duty to negotiate the open terms in good faith. *See Trianco, LLC v. IBM Corp.*, 583 F. Supp. 2d 649, 659 (E.D. Pa. 2008) (holding Type II obligations were binding up until termination).

In this case, the obligations remained in force up until the point of termination included the binding exclusivity provision, the prohibition on Intel's agreement to any third-party transaction causing it not to consummate the deal with 37celsius, and the parties' commitment to "work to close the transaction [with 37c] as quickly as possible." (R. 29-2 at 2-3.) These obligations are fully enforceable notwithstanding Intel's termination rights, as the term sheet itself makes clear: "Termination of this Term Sheet shall not affect any rights any party has with respect to the breach of this Term Sheet by another party prior to such termination." (*Id*. at 4) ("Termination").

Intel next contends the New York case law cited by 37celsius does not apply to a contract governed by Delaware law. (RB 39-40). In particular, Intel asserts Delaware does not follow the Second Circuit's five-factor framework for identifying a Type II agreement. (RB 39-40). Intel is mistaken. The *SIGA* cases "applied New York's bifurcated approach to preliminary agreements" and "imported New York's recognition of the binding force of preliminary agreements without adopting its concomitant limitations on expectation damages." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1142, 1144 (Del. 2015), as corrected (Dec. 28, 2015) (Valihura, J., *dissenting in part*). That includes the cases applying the five-factor framework for Type II agreements, which were cited repeatedly by the Delaware Supreme Court. *See, e.g., Cox*, 273 A.3d at 769, n.6 (*citing Brown*, 420 F.3d at 153); *SIGA I*, 67 A.3d at 349 n.83; *see also Cambridge Cap*., 565 F. Supp. 3d

at 441-42 (applying Delaware law and following the five-factor test to identify a Type II agreement).

Intel also attempts to distinguish the New York cases, but it misstates what those cases actually held. For example, Intel claims the parties in *CapLOC* agreed under a "legally binding" provision "to negotiate . . . for the [proposed] sale" of an entity. (RB 38, n. 11) But Intel's selective quotation leaves out the important facts. In fact, *CapLOC* held the term sheet there, like the term sheet here, (1) "obligate[d] the parties to negotiate exclusively over a period of time" and (2) "set[ ] out a general framework of material terms in non-binding fashion." 2018 WL 3407708 at *11. That is closely analogous to the facts here, but Intel fails to disclose that fact.

Similarly, Intel asserts the parties in *Cambridge Capital*, allegedly unlike Intel and 37celsius, "did not disclaim the intent to create binding obligations." (RB 36). That is false. The letter of intent in *Cambridge Capital* included a two-paragraph "Non-Binding Agreement" provision similar to the one in the term sheet here. 565 F. Supp. 3d at 433. The defendant there, like Intel, tried to "put[ ] dispositive weight" on the "non-binding" language. *Id*. at 443. Applying Delaware law, the court rejected that argument, holding that while the parties were not bound to consummate their intended deal, "they are not relieved of the obligation to negotiate the open terms in good faith within the framework of the terms agreed in the LOI." *Id*. at 444. The LOI in *Cambridge Capital* also included an exclusivity clause and allegations the defendant violated it. *Id*. at 432, 435. In other words, *Cambridge Capital* is analogous to the facts here. But one would not know any of that from reading Intel's misleading attempt to distinguish that case.

Accordingly, the Court need only look to established precedent applying Delaware law to reverse the district court's decision that the Term Sheet is not a Type II agreement.

III.    THE DISTRICT COURT MADE A CONTRACT INTERPRETATION, NOT A
        "BUT FOR" ANALYSIS

Intel misstates the district court's decision and "but for" analysis. The district court made a contractual interpretation in stating Intel could terminate the contract and prevent closing. (R. 47 at 14-15). In reality, such termination does not inhibit the district court from defining the Term Sheet as a Type II agreement. 37celsius would have acquired Care but for Intel's alleged breach of the Exclusivity provision. (R. 39 at 27, 29.) It "would have had the funds available to close on the transaction long before Intel could have negotiated and closed on the transaction with iSeed" had Intel told 37celsius it was "considering terminating the Exclusivity Provision." (*Id*. at 29.)

Any dispute over the material facts of whether 37celsius would have closed on the transaction should not have been delt with at the summary judgment stage. *State ex rel. Mitchell v. Wolcott*, 46 Del. 362, 368, 83 A.2d 759, 762 (1951)("[I]f it appears from the pleadings, depositions and admissions on file, together with the affidavits, if any, that there is a genuine issue as to any material fact, a motion for summary judgment must be denied.") Alexander Kempe, the founder of 37celsius, stated:

> [i]f Defendants had made 37celsius aware that they were considering terminating 37celsius's exclusive right to acquire Care before Defendants had any communication with iSeed or discussions about the sale of Care to iSeed, then I believe 37celsius would have had the funds available to close on the transaction long before Intel could have negotiated and closed on the transaction with iSeed.

(R. 36, ¶ 19) The district court called Kempe's assertions "merely speculat[ions]" and stated "Intel could have terminated the Term Sheet even if 37celsius had the funds available to close the transaction." (See R. 28-2, ¶ 9(a) SA 15)("Each party further acknowledges and agrees that each party reserves the right to terminate discussions and negotiations at any time and for any reason or no reason."); *see also* (R. 29-2 at 5, ¶ "Termination.")). However, the Delaware Supreme Court rejected the very argument that the necessarily hypothetical nature of the "but for" analysis renders

expectation damages "speculative, "conjectural", or too "uncertain," in *SIGA II*, 132 A.3d at 1129-32. Accordingly, the district court erred in its analysis.

37celsius significant investment in the negotiations ultimately served as consideration for Intel's promises in the Term Sheet (*See* R. 37 at ¶25.) This does not limit 37celsius to recovery of its out-of-pocket expenses. That is the reliance-damage-only rule the court rejected in *SIGA I*. The amount of consideration does not generally limit the amount of damages recoverable for breach. *See Cox*, 2022 WL 619700, at *9 (holding so long as consideration is present, "there is no additional requirement of equivalence in the values exchanged").

The district court refrained from developing a factual finding that 37celsius would not have closed the transaction to purchase Care but for Intel's breach of the agreement. Rather, the court found "[t] here was no express agreement to negotiate in good faith here. Nor could a factfinder conclude that, but for Intel's alleged breach of the Exclusivity provision, 37celsius and Intel would have closed the transaction—again, both parties could terminate negotiations 'for any reason.'" (SA 15; R. 28-2, ¶ 9(a)). The district court focused on two contractual principles: 1) the determination there was no express agreement to negotiate in good faith, and 2) the determination the parties could terminate the negotiations for any reason.

First, Delaware law does not require parties to expressly acknowledge their duty to "negotiate in good faith," using those words, in order to create a Type II agreement. On the contrary, courts have repeatedly recognized Type II agreements without such language. *See, e.g., EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 228 n.8 (S.D.N.Y. 2012) (collecting Type II cases where "there was no explicit, unambiguous good faith provision in the preliminary agreement").

Second, regarding the ability to terminate the Term Sheet, a Type II agreement does not, and need not, guarantee a final transaction will materialize; by definition, this type of preliminary agreement "does not commit the parties to their ultimate contractual objective." *SIGA I*, 67 A.3d at 349. That is the sense in which a Type II agreement is "non-binding," as the Term Sheet in *SIGA*, like the Term Sheet here, provided. *Id*. at 346. The parties are obligated to negotiate the open terms in good faith within the framework laid out in the Term Sheet, but not necessarily to consummate the final deal. *See Cox*, 273 A.3d at 765 (Under *SIGA I* "parties to Type II agreements have no obligation to enter a final agreement once they negotiate in good faith.").

The uncertainty of reaching a final deal is inherent in a Type II agreement, but it does not preclude expectation damages. Intel is incorrect in arguing otherwise. Delaware law clearly "permit[s] the recovery of expectation damages for bad faith breach of Type II agreements." *SIGA II*, 132 A.3d at 1138. To prove such damages, the plaintiff must show, as a factual matter, the defendant's breach caused him to lose out on the ultimate transaction. *Id*. at 1131. But the standard of proof is not certainty; it is "reasonable certainty," with doubts resolved against the breaching party. *Id*. at 1110, 1130-31.

The Delaware Supreme Court agreed with this analysis in *Cox Communications*. The preliminary agreement in *Cox* stated the parties "will enter into" a definitive agreement on terms "to be mutually agreed upon" for an initial three-year period of exclusivity. 273 A.3d at 756. The preliminary agreement contained no express agreement to "negotiate in good faith." That court easily classified that contract as a Type II preliminary agreement and imposed on the parties an "obligation to negotiate the open issues in good faith." *Cox*, 273 A.3d at 762. The obligation is simply the "straightforward" legal consequence of entering into a Type II agreement. *Id.* And the court in *SIGA* would agree.

Intel does not address the *Cox* court's decision that expectation damages can be based on an "obligation to negotiate in good faith," but Intel's analysis of *SIGA* is instructive. Correctly, Intel points the fact SIGA "disregarded" the term sheet that it had made a binding commitment to negotiate "in accordance with." 67 A.3d at 346-347. Then, SIGA attempted "to negotiate a definitive license agreement that contained economic and other terms drastically different and significantly more favorable to SIGA." *Id.* The court in *SIGA* determined SIGA acted in "bad faith" – which Intel has noted means "the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Id.* at 346. Here, the parties agreed negotiating in good faith required exclusivity between Intel and 37celsius—an agreement Intel immediately violated.

Following the courts' decisions in *Cox*, *Straine DM Holdings LLC*, *Greentech Consulting. Co.*, and *Est. of Landon*, Type II agreements contain an obligation to negotiate in good faith regardless of the words used. The court in *Greentech Consulting Co.* outlines this further in stating a lack of an express good faith obligation does not hinder the courts' ability to consider the Term Sheet as a preliminary agreement. 2022 WL 1499828, at *13 (Del. Super. May 11, 2022). "Type II preliminary agreements are binding and enforceable contracts." *Id*. An "agreement to agree is not fully binding on the open terms yet to be negotiated; but the parties are bound to negotiate those open terms in good faith." *Straine DM Holdings LLC*, 2025 WL 275408, at *4 (*citing Matter of Est. of Landon*, 2023 WL 5533132, at *3 (Del. Ch. Aug. 28, 2023)(emphasis added) Each of these decisions show the obligation to negotiate in good faith need not be written using a particular phraseology or magic words but is a part of all Type II agreements.

Intel's outline of the transaction fails to contend with the immediate breaches of the agreement. On the same day Intel and 37celsius signed the exclusivity provisions, Intel breached the agreement by attempting to create a bidding war between 37celsius and iSeed and were

weighing the two potential deals. Immediately after Intel and Care agreed they would not "initiate, solicit, entertain, negotiate, accept or discuss, directly or indirectly, any proposal or offer from any person or group of persons (other than 37C and its affiliates)," they began entertaining, negotiating and discussing offers from iSeed to acquire Care.

On February 2, 2017, Bryan Pruden, CFO of Care stated in internal emails: "I hear that Adam [Lin, of iSeed] is sweetening the deal," to which Kothari responded: "Adam matched all of Alexander's [37celsius'] terms, at least the ones that Jeff [Woolard, Intel's VP of Finance] said were important." (R. 37 at ¶ 21.) Pruden stated he wants to "keep ALL of the deals moving forward, …including [iSeed]…until we have cash in our account and a signed contract." (R. 37 at ¶ 21.)

Intel and Care continued to breach the Term Sheet and, on February 3, 2017, Intel and Care continued to discuss the competing offers from iSeed. Pruden noted, after the news of Care's VA award became public, "Adam upped his offer to $21M." (R. 37 at ¶ 22.) In response, Rhonda Holden of Care asked, "What about Alexander and 37c?" (R. 37 at ¶ 22.) Pruden responded and acknowledged they had no intention of honoring exclusivity and instead were engaging in a "bidding war." Specifically, he stated, "[w]e went from 2 options, (1) shut down, (2) AMC to a bidding war. This process has been crazy." (R. 37 at ¶ 22.)

Such violations, specifically the attempt to create a bidding war, did prevent 37celsius from finalizing a deal to purchase Care. Based upon communication among the Care team, Intel and Care had given formal approval to close a deal with 37celsius but were using 37celsius as both an approved backstop investor and to add pressure to iSeed to close for a higher price. Specifically, the Care team stated: "Jeff [Woolard] told me last night he has official approval to close with either, which looks like iSeed. But, see attached. I can't quite tell if 37 will get to its commitment Friday or not." (R. 37 at ¶ 32.)(emphasis supplied) Kothari responded: "I understand Alexander helps add

pressure." (R. 37 at ¶ 32.) It cannot be disputed Intel and Care violated the exclusivity clause, thereby operating in bad faith. That bad faith directly precluded 37celsius from acquiring Care after significant financial expenditures in the interest of such.

The district court also failed to adequately address the timing of Intel's motion on lost profits and value from the lost acquisition of Care. The motion was filed prior to the completion of a majority of discovery in this case. In granting Intel's motion, it limited the scope of 37clesius's discovery and prosecution of the matter. In doing so, 37celsius was substantially burdened.

IV.     THE COURT DID NOT MAKE A FACTUAL FINDING, BUT A FINDING ON
        CONTRACTUAL INTERPRETATION

Intel incorrectly frames the district court's holding regarding Intel's breach of the Term Sheet. Intel states the district court "correctly held that the Term Sheet was 'terminated on February 14 upon written notice by Intel that the closing would not occur due to 37celsius's inability to meet its financial obligations,' and that 'Intel thus did not breach exclusivity by closing with iSeed on March 1.'" (RB p. 45) (*citing* to R. 116 at 14-15, SA 44-45) However, contrary to Intel's assertions, the district court merely interpreted the Term Sheet. It did not make a finding of material fact. Regardless, the district court erred in its holding Intel did not breach the Term Sheet. The question of whether the Intel terminated the Term Sheet is a question of contractual interpretation. *See Benchmark Invs. LLC v. Pacer Advisors, Inc.*, No. N23C-03-171 MAA CCLD, 2024 WL 3567367, at *6 (Del. Super. Ct. July 29, 2024) (discussing the validity of notices for termination.)

There was a closing scheduled to occur on February 14, 2017. Due to some investors in 37celsius still completing their own due diligence, the closing was postponed. Intel, understanding the closing event would not occur on February 14, wrote to 37celsius "the Closing shall not occur." (R. 38 at ¶ 47.) This communication did not include any language similar to "termination," "notice

to terminate," or "hereby terminating." Rather, contrary to Intel's assertions, the communication left open the continuing relationship regarding negotiation and only cancelled the closing event.

Intel's own actions support this interpretation. Rather than terminate or cancel the negotiations with 37clesius, they continued to negotiate and sent an additional communication with the "suggested path forward." (R. 27-2 at 2). Intel even stated it would "go to our committee within the next 24 hours to get the ok for a delayed signing and closing next Tuesday," and "we would strongly encourage you to get the entire $12 million in funding lined up for next Tuesday." (R.27-2 at 2.) These actions do not demonstrate a company who terminated its relationship with 37celsius—precisely the opposite. These communications demonstrate the closing event was cancelled, but the negotiations continued—contradicting Intel's termination argument.

Intel argues "[b]ecause Intel terminated the Term Sheet on February 14, it could not have breached the exclusivity provision by selling Care to iSeed on March 1." (RB at 46.) There was no termination—but even if there was—Intel fails to respond to the core of 37celsius's claims. Intel's breach of exclusivity came long before the March 1 sale to iSeed. In fact, it started the same day Intel inked the Term Sheet with 37celsius and Intel continuously operated in breach of the exclusivity provision. Because the Term Sheet was not terminated, the exclusivity provision continued in full force, and Intel's ongoing negotiations with iSeed were additional breaches under the Term Sheet. The district court erred in holding the breaches did not violate the Term Sheet.

These breaches of the exclusivity provisions in the Term Sheet were not just detrimental to 37celsius's potential closing and purchase of iSeed. In reality, they prevented the purchase from ever occurring.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the district court's decision, reinstate 37celsius's claim for expectation damages against Intel for breach of the term Sheet and remand this action for further proceedings.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) and Circuit Rule 32 because, according to the word-count feature in Microsoft Word, the brief contains 5,528 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and Circuit Rule 32 because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point proportional font for the body of the brief and 11-point proportional font for footnotes.

Dated: April 18, 2024

*Electronically signed by Gabriel D. Grahek*
**Gabriel D. Grahek (Counsel of Record)**
**Hansen Reynolds, LLC**
301 N. Broadway, Suite 400
Milwaukee, WI 53202
(414) 455-7676
ggrahek@hansenreynolds.com